UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,          :

          - v. -          :          S2 07 Cr. 348 03(RPP)

RAVEENDRA PUTTARAMU,               :
LOKESH BHAT,
SRINIVAS KASI,                     :

        Defendants.    :

- - - - - - - - - - - - - - x

**GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO
THE DEFENDANT'S MOTION FOR A NEW TRIAL**

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
Attorney for the United States
   of America.

SHARON E. FRASE
Assistant United States Attorney
   - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,            :

                - v. -               :        S2 07 Cr. 348 (RJP)

RAVEENDRA PUTTARAMU,                 :
LOKESH BHAT,                         
SRINIVAS KASI,                       :

              Defendants.            :

- - - - - - - - - - - - - - - -x

### GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANT'S MOTION FOR A NEW TRIAL

        The Government respectfully submits this memorandum of law
in response to the motion by defendant Srinivas Kasi, pursuant to
Rule 33 of the Federal Rules of Criminal Procedure, for a new
trial.  In support of his motion, the defendant argues that the
jury was impermissibly tainted and prejudiced by the Government's
reference in its closing rebuttal argument to a wire transfer the
defendant made one day after his co-conspirators were arrested.
For the reasons that follow, the defendant's motion should be
denied in its entirety.

                        <u>BACKGROUND</u>

        On July 31, 2007, Raveendra Puttaramu, Lokesh Bhat and
Srinivas Kasi were charged in a three-count superseding Indictment,
S2 07 Cr. 348 (the "Indictment").  Count One charged the defendants
with conspiracy, in violation of 18 U.S.C. § 371.  The objects of
the conspiracy were (a) to violate Title 7, United States Code,

Section 2024, which prohibits food stamp fraud; and (b) to violate Title 18, United States Codes, which prohibits stealing money or things of value from the United States.    Count Two charged the defendants with the substantive crime of food stamp fraud, in violation of 7 U.S.C. § 2024.    Count Three charged the defendants with the substantive offense of stealing money or a thing of value from the United States, in violation of 18 U.S.C. § 641.

Puttaramu and Bhat pleaded guilty to the Indictment prior to the start of the trial.    Kasi was convicted on all counts, following a five-day jury trial, on January 9, 2008.

A.  The Evidence at Trial

The evidence at trial established beyond a reasonable doubt that Kasi was the leader of a conspiracy to defraud the federal government of hundreds of thousands of dollars from at least January 2006 until April 12, 2007, by giving customers at the store he owned, Akhila, cash in exchange for their food stamp benefits. The evidence included (1) the testimony of Puttaramu, who pleaded guilty pursuant to a cooperating agreement and described the inner workings of the scheme; (2) several witnesses from the United States Department of Agriculture ("USDA") Food and Nutrition Service ("FNS") who, among other things, described the rapid expansion of food stamp redemptions at Akhila, which were far greater than comparably sized grocery stores; (3) video and audio tapes of conversations involving confidential informants, who

2

actually redeemed cash for food stamps at Akhila;(4) records from the FNS demonstrating the huge number of food stamps redemptions at Akhila;(5) various bank records for Akhila and Kasi accounts, which established that Kasi has sole control over the monies received by Akhila as food stamp reimbursements, and (6) other documentary evidence, including a notebook used by Puttaramu to maintain records of the food stamp redemptions, that he reviewed with Kasi almost every evening.

At trial, Puttaramu testified that when he came to the United States in 2004 to work at Akhila, Kasi trained him to run the store, including the cash register, accounting, pricing, and purchasing. (Tr. 147, 150, 167-68). Puttaramu was working at Akhila when the store starting accepting food stamp benefits for payment, and it was Kasi who trained Puttaramu on how to work the Electronic Benefits Transfer ("EBT") card reader. (Tr. 152, 157, 160-61). As Puttaramu testified, Kasi initially instructed him to turn down customers who asked for cash in exchange for food stamp benefits. (Tr. 163-65). But in the fall of 2004, in order for Kasi to make more money from his store, Kasi started trafficking with food stamp recipients from the neighborhood. (Tr. 174-76). Specifically, Kasi would redeem a quantity of food stamp benefits for cash, and would charge a fee of typically 30 percent of the value of the transaction. For example, for a food stamp redemption valued at $100, the customer would receive $70, and Akhila (and

therefore Kasi) would receive $30.  When Akhila's food stamp bank account was reimbursed by the FNS for the entire value of the $100 transaction, therefore, the $30 transaction fee would be profit to Kasi for the sale of the food stamp benefits.  According to Puttaramu, this practice began before Kasi started a new full time job in 2005, and before Lokesh Bhat, Kasi's nephew, bought into the business and took over responsibility for the store's daily operation.  (Tr. 170-71, 176, 198-201).  When Bhat came by to look at the store before buying in, Kasi explained the food stamp fraud to Bhat.  (Tr. 204).

From the beginning, Kasi was intimately involved in the fraud.  Kasi himself devised the ground rules for the scheme, instructing Puttaramu to give customers seventy cents on the dollar.  (Tr. 177, 236).  Kasi also instructed Bhat and Puttaramu to engage in certain subterfuges to hide these transactions from authorities.  Kasi directed Bhat and Puttaramu to require customers to buy a small amount of food to help hide the transaction, and that larger transactions for amounts like $150 should be processed as two smaller transactions, with a delay in between.  (Tr. 236-240).  According to a witness from the FNS, Preston Mears, these patterns, which are some of the indicators of fraud, appear in the electronic food stamp redemption data for Akhila maintained by the FNS.  (Tr. 394-95).

Although Kasi stopped working at the store full time after 2004, the evidence showed that he stayed involved in the food stamp fraud right to the end.  First, Puttaramu testified that Kasi continued to work at the store occasionally, and that when Kasi was behind the counter he redeemed food stamps for cash. (Tr. 240-41). Moreover, after Kasi stopped working regularly at the store, Puttaramu fully briefed Kasi about the store's operations on a daily basis.  Puttaramu testified that every night when he returned to Kasi's apartment from the store, he had to account for the day's cash flow, including the food-stamps-for-cash redemptions.  (Tr. 170-72, 238).  He did this in notebooks that he transported to and from the store, along with the opening and closing balances from the register.  (Tr. 169, 173).  Puttaramu demonstrated this to the jury during trial, and explained, using his own contemporaneously written notebook, how he had to account to Kasi for every dollar from the opening balance to the last purchase of the day, using April 6 and 11, 2007 as examples.  (Tr. 255-272).  In addition to all of the store's cash expenses for the day, each individual food stamp trafficking transaction was written down in a series of columns.  (Tr. 255-56). The total food stamp redemptions and the total register receipts were also recorded, as was the intake from Lotto and Western Union.  (Tr. 257-58).

Kasi was equally well-versed in Akhila's larger financial picture, as confirmed from a number of sources.  First, Paul

5

Covington, Kasi's accountant, testified that Kasi provided Covington with monthly and quarterly sales figures well after Bhat had taken over the store.  Kasi also had a rough idea of the costs and expenses for the store.  He provided a detailed list of daily receipts (although not the underlying documentation) to Covington for Akhila's 2004 tax returns.  (Tr. 475, 477).  In 2006, Kasi also provided a cost of goods sold figure (albeit an unsupported one) to Covington for the store's 2005 tax returns.  (Tr. 480-81, 485-87).  Kasi wrote the monthly checks for rent and utilities.  (Tr. 558-61).  He purchased food from P. East Trading and Goya by check.  (Tr. 561-62).  He saw the total cash expenses every day from Puttaramu's accounts.  (Tr. 269-71).

Covington's testimony regarding the sales figures included in the store's tax filings corroborated Puttaramu, who testified that total monthly sales were $22,000 in 2004, between $24,000 and $27,000 in 2005, between $28,000 and $32,000 in 2006, and between $32,000 and $34,000 in the first quarter of 2007.  (Tr. 243).  Puttaramu also confirmed the cost of goods sold per month -- $16,000 in 2005, and $19,000 to $20,000 in 2006 (Tr. 244) -- and the monthly expenses, which remained constant at $9,500 to $10,000 until 2007, when they increased to $12,000.  (Tr. 245-46).

Of course, despite the fact that Kasi was well aware of the actual monthly sales and costs of good sold, Kasi himself well knew that Akhila was receiving much larger monthly amounts in food stamp

redemptions than either actual monthly sales or costs of goods sold. In particular, therefore, in addition to the evidence that Kasi knew roughly how much the store took in and what it cost to run Akhila every month, the Government established that Kasi retained full control over the account at Valley National Bank set up to receive food stamp money (the "Valley National Account"). Kasi was the only signatory on the checks from Valley National, and the account statements went to Kasi's apartment on East 95th Street. (Tr. 558; see also Valley National Bank statements at GX 15 and 16). He therefore was well aware of how much money was coming into and out of the Valley National Account every month.

Kasi's access to the Valley National Account, into which all of the food stamp redemptions were deposited, made clear that it was Kasi who stood to benefit from this illegal food-stamp-for-cash scheme. Moreover, because Kasi was the only person who had access to these funds, Kasi played an ongoing, critical role in the conspiracy (besides simply reaping the benefits of the fraud he organized). In the second half of 2005, as the number of illegal food-stamp-for-cash redemptions at the store grew, there was not enough cash from the store to hand out to customers, particularly in the first two-thirds of the month. Puttaramu explained how he would have to go downtown to meet Kasi at his job, and how he and Kasi would go to Valley National Bank to withdraw cash which Puttaramu would bring back to the store. (Tr. 212-218). This

practiced continued until the day Puttaramu was arrested. (Tr. 219).[1]

From evidence that Kasi had complete control over the food stamp funds, the Government also established that Kasi received fraud proceeds. For the period January 1, 2006 to April 12, 2007, the FNS deposited approximately $833,860 into the Valley National Account by the FNS. (Tr. 555). From Puttaramu's testimony the Government established that only a small portion of that figure, about 5%, represented food stamp benefits that were actually redeemed for food. (See Tr. 271-72). Of the approximately $800,000 in remaining food stamp funds, the Government established through Puttaramu that Akhila disbursed 70%, or approximately $560,000, to food stamp customers in the form of cash, leaving approximately $240,000 in fraud proceeds that Kasi alone controlled. (Tr. 177).

As forensic accounting expert Gerald Levy testified, some of the fraud proceeds in the Valley National Account were used for business expenses such as rent, utilities, and purchases of dry goods. (Tr. 559-62). But Mr. Levy also identified deposits Kasi made into his Commerce Bank accounts, checks Kasi wrote to pay off

---

[1] Indeed, the fact that Puttaramu had such regular contact with Kasi, including almost every night after work, supports the Government's argument that it was a fair inference for the jury to draw that Kasi learned almost immediately that Puttaramu had been arrested, and certainly before he sent the $46,000 wire transfer to India that is the subject of Kasi's new trial motion.

the balances on his credit cards, and ATM cash withdrawals, all from the Valley National Account. (Tr. 561-62). In the 15-months before Puttaramu and Bhat's arrests, these categories totaled at least $43,000. (See GX 3505-N). During the entire time that Akhila was redeeming food stamp benefits, such payments and withdrawals totaled more than $92,000. (GX 3503-E). Finally, Mr. Levy identified a $46,000 wire transfer that Kasi made to his wife's account in India from his Commerce savings account on April 13, 2007, the day after Puttaramu and Bhat were arrested. (Tr. 578-79).

B.  <u>The Government's Summation</u>

The Government argued in summation that food stamp fraud clearly was happening at Akhila from January 2006 to April 12, 2007, and that the only real question the jury had to resolve was Kasi's knowing participation in the fraud. Kasi's knowledge was the central issue throughout the jury address, from the opening lines describing Kasi's role not only "behind the counter" but also "behind the scenes" (Tr. 679), to the final moments of the summation:

> He is the president and owner of a company. Its his financial future, his money, he is the person writing these checks out to cash, and just ask yourselves, is there any way he couldn't know what was going on, between that and the size of the redemptions that were coming into his bank account that only he . . . control[led].

(Tr. 705-06; <u>see also</u> Tr. 692 ("The only thing at issue with the

food stamp fraud charge is the defendant's involvement"); 693
("[T]he key question here is: Did Kasi take part in the theft?
Did Kasi take part in the fraud?"); 695 (defendant's role "really
the only issue in this trial"); 701 ("What about when he
transferred this operational responsibility to Mr. Bhat in 2005?
What other evidence do we have that Kasi continued to stay involved
in the conspiracy?").)

The Government turned first to the evidence that the fraud
started when Kasi was still at Akhila every day, pointing to the
presence of large (over $50 and over $100) transactions "right off
the bat" in October and December of 2004. (Tr. 700-701.) The
Government then discussed Kasi's role after Bhat arrived on the
scene, highlighting much of the evidence discussed above, including
the fact that Kasi did not give up control of Akhila's bank
accounts (Tr. 702), that he was the sole signatory on the Valley
National Account (id.), that the bank statements were mailed to his
home (Tr. 703), that Kasi fed financial information to the
accountant, Paul Covington (Tr. 701), and that Kasi was pulling
cash out of the Valley National Account in amounts much larger than
necessary for the operation of the store (Tr. 703-04).

C.  The Defense Summation

The defense summation focused almost entirely on Kasi's
claim that he had washed his hands of the business in 2005 and
since then had not been involved in the store's day-to-day

10

operations.  (See Tr. 708 ("my client gets a job, a full-time job,
with a construction company in New York City"); 708-09 ("He also
brings in Mr. Bhat," who is "a part owner"); 716 ("What did he do?
He relied upon his nephew.  He relied upon this gentleman from
India to operate the business."); 717 ("I am not going to say they
didn't show that there was a fraud, but did they prove beyond a
reasonable doubt that my client aided and abetted that?  Or is the
reasonable question, did he not know?  And was he not told? And was
he left in the dark about this?")).  In support of this argument,
the defense pointed to the lack of proof that Kasi was at the store
and doing food stamp transactions after 2004:

> Now, in 2004, 2005, which is not part of the
> indictment and not part of the crimes charged, Bhat
> and Puttaramu are running the show. Then in 2006,
> as you saw, these redemptions skyrocketed.  They
> went up exponentially.  My client, once again, the
> evidence indicates that he was not there.  There
> was not a single customer that identified my client
> that they could find, not a single independent
> verification by videotape or audiotape or security
> camera that my client was present at the store
> during any of the redemptions.

(Tr. 713).

        Not only was Kasi supposedly not there, but according to
the defense, he wasn't being briefed every day as Puttaramu
claimed.  Referring to Government Exhibit 8, the notebook in which
Puttaramu had been noting down the daily cash flows for March and
April 2007, defense counsel stated:

> [T]here is nothing in that book, zero, that
> indicates my client ever saw it, that he ever signed

> anything on it, that he ever initialed, that he ever
> reviewed it, other than Puttaramu saying, Yeah,
> every night I brought it home and showed it to him
> and gave it to him and he said, OK, and we discussed
> it all. Well, of course he is going to say that,
> right? Because that shows knowledge. That shows
> that he is part of the whole agreement. That shows
> he aided and abetted it.

(Tr. 714).

The defense also submitted that the sheer size of the food stamp redemptions – as evidenced by the deposits in the Valley National Account – was not enough reason why Kasi should have known of the fraud at the store:

> Much will be said that when the food stamp account
> keeps going up, I guess Kasi should have known,
> right? But what we don't have here is any proof
> whatsoever by any form really of what the operating
> expenses were at the store. If you're making
> $90,000, it would be nice, if there is a fraud going
> on and someone came to you and said, Here is the
> balance sheet and it shows that we only sold $5,000
> worth of goods, but there is no balance sheet for
> any of this time. There is no information provided
> at all.

(Tr. 716).

The defense also downplayed the significance of Kasi's control over the bank accounts, and Puttaramu's twice-weekly visits to Kasi for cash in the middle of the workday. (See Tr. 709 ("Yes, the accounts are in Kasi's name. But from 2005 to 2007, where is Kasi? Where is he? He is at his job in midtown. He is not up at Akhila in Harlem swiping the cards"); 714 ("[Puttaramu] says to Kasi I need X, and Kasi just gives him a check and he goes to Valley National.").  Instead, the defense claimed that it was

12

Puttaramu and Bhat who "controll[ed] the finances" and "took the money." (Tr. 716).

Finally, defense counsel asked the jury to scrutinize the Government's evidence that Kasi deposited funds from the Valley National Account into his personal accounts at Commerce Bank, thereby placing directly at issue the transfer of fraud proceeds into and out of the Commerce accounts. (Tr. 717).

D.   The Government's Rebuttal

The Government began its final address by returning to the true nature of the business arrangement between Kasi and Bhat:

> Bhat may have worked in the store but he didn't run
> the business like he was supposed to under the terms
> of the agreement.   Kasi did.   Kasi maintained
> control of all the bank accounts; most importantly,
> the Valley National Bank account.  That's where all
> the EBT transfers went in, all the way up through
> 2007.  Look at those records, which are in evidence.
> You'll see, like I said, that they went to Kasi's
> apartment, that he was the only signatory.  But also
> look at the agreement and what it says about Mr.
> Bhat's responsibilities for doing things like paying
> rent and utilities.   Look at the checks that are
> drawn on the Valley National Bank account in 2006
> and I think even in 2007.   Kasi is the one paying
> rent on these store, paying Con Ed, paying the
> utility bills, making payments to vendors like P.
> East Trading and Goya Food.

(Tr. 722).  The Government also pointed to a July 2007 letter that Kasi's attorney, at Kasi's direction, sent to Bhat months after Bhat's arrest, to make it appear as though Kasi was really trying to make Bhat live up to his part in the agreement. Referring to the letter's insistence that Bhat comply with the promise set forth in

13

the agreement to pay Kasi $3,000 a month, the Government asked, "[H]e can't be serious, right, because Kasi controlled the bank accounts into which all the money for the business went? So how could Bhat pay Kasi $3,000 a month?" (Tr. 723). Later the Government argued that "this letter is designed to make sure that someone thinks that Kasi didn't know what was going on. But you can see through this letter and you can see through the agreement." (Tr. 723).

The Government emphasized how unlikely it was that Puttaramu or Bhat were taking the proceeds of the fraud, noting that Kasi "kept a tight rein on the finances" and "would have noticed if something was missing." (Tr. 724). Indeed, "if Puttaramu had drawn a check on cash from Valley National Bank or some money was missing at the end of the day, he was answerable for it." (Tr. 724). Furthermore, "Kasi would have stopped Puttaramu from going to the bank or taking responsibility for carrying cash to and from the apartment and, as Puttaramu told you, that never happened." (Tr. 724). The Government then returned to Kasi's real understanding about the reason for all the cash withdrawals from the Valley National Bank Account, pointing out:

> Kasi was writing checks every day, or, I'm sorry, twice a week in the first early part of the month when the food stamp business was really cooking, when they ran out of money in the middle of the day, Kasi was writing checks and walking Puttaramu to the bank and handing over cash. Don't you think if he didn't know what was going on, he would be asking some questions like what's this money for, or, boy,

14

you guys really should slow down, I don't even know
what you're spending this money on?  I mean, after
all, it's his money.  But he doesn't do that, and he
doesn't do that because he knows exactly what the
money is for.  And Kasi and Puttaramu don't need to
discuss over the phone, and Lokesh and Kasi don't
need to discuss over the phone why Puttaramu was
coming downtown to midtown to pick Kasi and check up
and go get cash.  They don't need to discuss it
because the fraud started, like we showed, back in
2004, and Kasi knew what it was for.  So of course
they are not going to have discussions over the
phone.  They're going to give him a number, tell him
what they need for that day, and go and get it.

(Tr. 725).

The Government directly answered the defense's question
regarding who stood to benefit from the fraud -- Kasi. "He
controlled the purse strings so he stood to make the money." (Tr.
725) Even though Kasi had "stepped back from the business . . . at
the time where it really began to take off," he "kept his hand in
the profits." (Tr. 725-26). Furthermore, the Government argued,
Bhat and Puttaramu could not have been stealing from Kasi.
Everything that is coming into the store during the day is leaving
in the form of cash payments to food stamp customers. (Tr. 726).
The 30% commission was being deposited directly into the Valley
National Account, from which only Kasi can withdraw money.

The Government also addressed the defense's argument that
Kasi did not have a point of reference from which he could tell
that food stamp redemptions were outpacing sales. (Tr. 727). The
Government argued that, in reality, Kasi had a very good
understanding of this information and was providing it to Paul

15

Covington well into 2006.  (Tr. 727-28).

After reviewing more of the evidence that corroborated Puttaramu's testimony, the Government returned to the issue of Kasi's knowledge one last time, and drew the jury's attention to yet another piece of evidence "in considering whether or not Mr. Kasi was acting throughout this whole time with knowledge of exactly what was going on and that he was directing it." (Tr. 729).  The Government referred back to the end of Gerald Levy's direct, (Tr. 578-79), in which he identified a $46,000 wire transfer from Kasi's Commerce Bank savings account:

> April 13th, the day after Puttaramu and Bhat are arrested, what does Mr. Kasi do?  He wires $46,000 to his wife's account in India, having at least, according to the records that you have from Commerce Bank, Valley National and all the other bank accounts he controls, having never done anything like that before, although he did send money overseas.  He sent $46,000 to India the day after his employees were arrested.  What does that tell you about how nervous Kasi is about whether he's next?

(Tr. 729-30.)

E.  The Defense's Objection

At the conclusion of the Government's rebuttal, the defendant objected at sidebar to the Government's statements "about the consciousness of guilt related to that wire transfer." (Tr. 732.)  The colloquy with the Court, in relevant part, was as follows:

> MR. CONDON:  There was no evidence that my client was aware that Mr. Puttaramu or Mr. Bhat was

16

arrested at the time of the making of that transfer. There was zero testimony in this regard to prove that. So there is no motive -- the government is arguing that he knew that he had been arrested and therefore he made the transfer. There is no evidence to support that whatsoever.

THE COURT: I think that's true.

MS. FRASE: It is a fair inference the jury can draw based on the actions he took, and then, as I pointed out to the jury, that that was the only instance of that size and nature of transfer. The proximity in time to the arrest of his two primary -- the people running his store after there had been a search warrant at the premises, and if there is no evidence, it is certainly something that the jury could fairly look at to say whether or not he in fact did know they had been arrested and what actions he took to conceal his own involvement after they were.

THE COURT: What do you want me to do about it, Mr. Condon?

MR. CONDON: I don't know, your Honor. I mean, I think that it is prejudicial to my client to have it hanging out there when we know that there was no testimony that he was made aware of it, that there was a search warrant, that he was made aware that there was an arrest of either individual, and now the government has closed with that giant screen with the wire transfer alleging that there is some malfeasance related to the wire transfer.

MS. FRASE: We are not alleging it as a malfeasance in and of itself. We are showing what is in the defendant's --

THE COURT: I will instruct the jury that there is no evidence in this record showing that Mr. Kasi was aware of the arrests of the two codefendants.

(Tr. 732-33.)

The Court then proceeded to give the following instruction to the jury:

17

THE COURT:  Ladies and gentlemen, I don't believe there is any evidence in this record that Mr. Kasi was aware of the arrests of the codefendants, Mr. Bhat and Mr. Puttaramu, on April 12th.

(Tr. 734.)

## ARGUMENT

Kasi's sole argument is that the Government's reference in rebuttal to the $46,000 wire transfer to India on April 13, 2007 warrants a new trial.  Specifically, Kasi argues that there was no evidence in the record that the defendant knew of the arrests or the search.  (Br. 3).  In the absence of any such evidence, the defendant argues that it was improper for the Government to draw the jury's attention to the wire transfer as evidence of Kasi's "culpable mental state", on the theory that he was attempting to move fraud proceeds out of the country.  (Br. 4).

The defendant's characterization of the "wire transfer" comment as prejudicial is not warranted, and his reliance on the reference as a basis for a new trial should be rejected.  Both the fact of the transfer and the suggested inference were supported by the evidence in the trial.  The Government was entitled to explain its view of the evidence to the jury in summation, and to argue the permissible and reasonable inferences that could fairly be drawn from the factual evidence presented at trial.  Specifically, the Government was entitled to rebut the defense's claims that Kasi did not know about the fraudulent food stamp redemptions happening at Akhila with this consciousness of guilt evidence.  Indeed, while

18

there was no direct evidence that Kasi was aware of the arrests, there was powerful circumstantial evidence of that fact, including that one of the arrestees, Bhat, was Kasi's nephew, and the other arrestee, Puttaramu, lived with Kasi and met with Kasi almost every night about the operation of the store. Moreover, even if the statements were improper, Kasi could not have suffered substantial prejudice so as to warrant a new trial, because there is no possibility that the verdict would have been different without the alleged error.

A.  Applicable Law

Rule 33, Fed. R. Crim. P., provides in relevant part that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." While the authority granted to a district court by Rule 33 is broad, appellate courts -- recognizing that a judge's grant of a new trial is fundamentally inconsistent with the deference ordinarily shown jury verdicts -- have consistently imposed restrictions on a district court's discretion to order a new trial. As the Second Circuit has stated: "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001) (citing United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992)); see also United States v. Autuori, 212 F.3d 105, 120 (2d Cir. 2000) ("[A] new trial is proper when a district

court 'is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.'") (quoting United States v. Landau, 155 F.3d 93, 104 (2d Cir. 1998)).  A motion for a new trial should not be granted unless, after evaluating all of the evidence, the district court is left with a "real concern that an innocent person may have been convicted." Ferguson, 246 F.3d at 134 (citing Sanchez, 969 F.2d at 1414). Thus, in order to justify the grant of a new trial -- and ensure that the district court has struck the right "balance between weighing the evidence and credibility of witnesses and not 'wholly usurp[ing]'" the role of the jury -- the district court "must exercise the Rule 33 authority 'sparingly' and in 'the most extraordinary circumstances.'"  Ferguson, 246 F.3d at 133-134. Rule 33 requires that the court examine the entire record of the trial in determining whether the verdict was a manifest injustice. See id. at 134 ("The district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation.").

A defendant asserting that a prosecutor's remarks warrant reversal "face[s] a heavy burden, because the misconduct alleged must be so severe and significant as to result in the denial of [his] right[ ] to a fair trial."  United States v. Locascio, 6 F.3d 924, 945 (2d Cir. 1993).  As the Second Circuit has repeatedly stated, "[t]he government [and the defendant, for

that matter] has broad latitude in the inferences it may reasonably suggest to the jury during summation." United States v. Casamento, 887 F.2d 1141, 1189 (2d Cir. 1989); United States v. Rahman, 189 F.3d 88, 140 (2d Cir. 1999); United States v. Nersesian, 824 F.2d 1294, 1327 (2d Cir. 1987); United States v. Suarez, 588 F.2d 352, 354 (2d Cir. 1978). Thus, "[i]t is a 'rare case' in which [even] improper comments in a prosecutor's summation are so prejudicial that a new trial is required." United States v. Rodriquez, 968 F.2d 130, 142 (2d Cir. 1992) (quoting Floyd v. Meacham, 907 F.2d 347, 348 (2d Cir. 1990)); see also United States v. Young, 470 U.S. 1, 11 (1985) ("A criminal conviction is not to be lightly overturned on the basis of a prosecutor's inappropriate comments standing alone.").

Even where a prosecutor's statements are found to be improper, that misconduct is grounds for reversal "only if it causes the defendant substantial prejudice so infecting the trial with unfairness as to make the resulting conviction a denial of due process." United States v. Shareef, 190 F.3d 71, 78 (2d Cir. 1999) (internal quotation marks, citations, and brackets omitted). In evaluating whether a defendant has suffered "substantial prejudice," the Second Circuit has stated that the district court must look to three factors: "'the severity of the misconduct, the measures adopted to cure it, and the certainty of conviction in the absence of the misconduct.'" United States v. Parkes, 497 F.3d

21

220, 233-34 (2d Cir. 2007) (quoting United States v. Melendez, 57 F.3d 238, 241 (2d Cir. 1995));  United States v. Rosa, 17 F.3d 1531, 1549 (2d Cir. 1994) ("Determination of whether there should be a reversal requires an evaluation of the severity of the misconduct, the curative measures taken, and the certainty of conviction absent the misconduct.").

B.  The Government's Statements on Rebuttal Were Not Improper and Did Not Cause Substantial Prejudice to the Defendant

There was nothing improper about the Government's reference on rebuttal to the wire transfer.  A prosecutor is "entitled to respond to the evidence, issues, and hypotheses propounded by the defense."  United States v. Marrale, 695 F.2d 658, 667 (2d Cir. 1982).  The Government was permitted to suggest the inference, as characterized by the defense, "that defendant acted in an effort to conceal profits and with a consciousness of guilt immediately after the arrest of Puttaramu and Bhat."  (Br. 4).  Such an inference does indeed go "directly toward defendant's knowledge," and as the defense concedes, "the defendant's knowledge of and participation in the criminal activity was the central issue raised" in the trial. (Br. 4).

Kasi's entire defense was that Puttaramu and Bhat alone were responsible for the food stamp trafficking at the store, about which he knew nothing.  It is certainly relevant that the day after the arrest of the two people whom Kasi blames for the fraud, Kasi sends $46,000 to India, out of the reach of U.S. authorities.  The

Government argued throughout its closing remarks that Kasi's knowledge could be inferred from, among other evidence, the control he exercised over those funds, and the extent to which he personally benefitted from the fraud by transferring those funds to his personal accounts.

Of course, neither the prosecution nor the defense may refer to facts that are not in the record or misstate the evidence. See Suarez, 588 F.2d at 354. It is certainly reasonable, however, for the government to suggest to the jury inferences that can be fairly drawn from the record. See Casamento, 887 F.2d at 1189; see also United States v. Myerson, 18 F.3d 153, 163 (2d Cir. 1994) ("The 'prosecution and defense are entitled to broad latitude in the inferences they may suggest to the jury during closing argument,' provided they do not misstate the evidence") (citations omitted); United States v. Rodriquez, 968 F.2d 130, 143 (2d Cir. 1992) ("The government is entitled, in summation, to argue all inferences that may permissibly be drawn from the evidence admitted."); United States v. Roldan-Zapata, 916 F.2d 795, 807 (2d Cir. 1990); United States v. Wilner, 523 F.2d 68, 74 (2d Cir. 1975) ("A prosecuting attorney is not an automaton whole role on summation is limited to parroting facts already before the jury."); United States v. White, 486 F.2d 204, 207 (2d Cir. 1973) ("Certainly, advocates may marshal all inferences that the evidence supports and indulge in nonprejudicial flourishes of rhetoric.");

23

United States v. Dibrizzi, 393 F.2d 642, 646 (2d Cir. 1968)
("Within broad limits, counsel for both sides are entitled to argue
the inferences which they wish the jury to draw from the
evidence."); United States v. Wexler, 79 F.2d 526, 530 (2d Cir.
1935)(the government's summations need not and ought not consist of
"such detached exposition as would be appropriate in a lecture").

        The evidence presented at trial more than adequately
supported an inference that Kasi wired money out of the country
after learning that his business partner and store manager had been
arrested, the premises searched, and evidence seized from the
store.  The inference was a reasonable one for the jury to draw
from the evidence that Bhat was Kasi's nephew, and that Puttaramu
lived with Kasi and returned to the apartment from the store each
night, where they would review the accounts for the day.  (Tr. 169-
72).  The jury also heard evidence that Puttaramu did not return to
Kasi's apartment on the night of April 12, because, as he
testified, he was detained in the MDC from that day onward (Tr.
137).

        Nor did the Government act improperly in drawing the jury's
attention to the $46,000 wire over any others in the bank records.
As the Government noted in its rebuttal, the April 13 wire transfer
was distinguishable from the others that Kasi made during the
period of the conspiracy.  (Tr. 730).  It was the only wire out of
Kasi's savings account at Commerce.  It was the largest wire by far

that Kasi sent from either of his Commerce accounts.  (<u>See</u> GX 18 at control nos. 436, 529, and 772).  Of the three other transfers Kasi sent out of the United States between 2005 and 2007, none exceeded $5,000.  These smaller wires, while not sent with exact regularity, are all spaced out by a minimum of *thirty-one* weeks.  In contrast, Kasi sent the $46,000 wire only two days after sending a $5,000 wire to his wife on April 11. (<u>See</u> GX 17 at control no. 375; <u>See also</u> GX 18 at control no. 436).  Indeed, the fact of this large, one-of-a-kind wire transfer alone was enough for the jury to draw the inference that Kasi was trying to conceal fraud proceeds by sending money to India.  Accordingly, given all of this evidence, and the permissible inference the jury could draw that Kasi knew about his employee's arrests, it required no great leap for the jury to conclude that Kasi sent the money out of the country before the Government could freeze the accounts or arrest him, and which thereby demonstrated his guilty knowledge.

       To the extent the comments could be viewed as improper -- and the Government asserts that they were not -- any harm was cured by the Court's limiting instruction only moments after the alleged misstatement, which was made near the end of the Government's rebuttal.  As soon as the Government finished, defense counsel objected.  (Tr. 730).  Immediately after the sidebar, the Court instructed the jury that there was no evidence in the record that

Kasi knew about the arrests of Puttaramu and Bhat. (Tr. 733-4)[2]. The Second Circuit has recognized that even in a case where there is "serious misconduct," "proper instructions by the trial court may suffice to prevent undue prejudice and make the misconduct harmless." United States v. Walker, 835 F.2d 983, 988 (2d Cir. 1987). Furthermore, "it is axiomatic that jurors are presumed to follow these instructions." United States v. Beverly, 5 F.3d 633, 641 (2d Cir. 1993); accord United States v. Downing, 297 F.3d 52, 60 (2d Cir. 2002). Therefore, since the Court instructed the jury that there was no evidence that Kasi knew of the arrests, the jury is presumed to have followed this instruction and to have viewed the Government's rebuttal in light of that directive.

Moreover, "[i]nappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding." United States v. Young, 470 U.S. at 11-12; United States v. Melendez, 57 F.3d 238, 241 (2d Cir. 1995). Kasi's allegation concerning misconduct in this case are directed solely at one argument by the Government in rebuttal. The defendant has not suggested that the

---

[2]    It is worth noting that, while the record does not contain direct evidence of Kasi's knowledge of the arrests -- although strong circumstantial evidence supports the inference that he knew -- such an inference is accurate. Kasi was actually present in Magistrate's Court on April 12, 2007, while Puttaramu and Bhat were being arraigned.

Government conducted itself improperly throughout the trial, nor has he pointed to any other defect in the conduct of the trial.

Finally, Kasi cannot come close to demonstrating that letting the guilty verdict in this case stand "would be a manifest injustice," nor that upon evaluating all of the evidence in this case, there is a "real concern that an innocent person may have been convicted." <u>Ferguson</u>, 246 F.3d at 134. To the contrary, a conviction in this case was a near certainty, even absent the misconduct. There was plentiful evidence to support the jury's conclusion that Kasi was deeply involved in the food stamp fraud at Akhila. As described in detail above, that evidence included Puttaramu's testimony regarding Kasi's role in the scheme, his familiarity with Akhila's finances, and his tight control over the funds generated from the fraud; the detailed bank records establishing the huge amounts of money going into Akhila's accounts from food stamp redemptions, which were controlled only by Kasi and which far exceeded monthly non-food stamp revenues and costs of goods sold; the excessive numbers of food stamp redemptions for a store of Akhila's size, which was indicative of fraud; and other proof demonstrating Kasi's day-to-day involvement in the operations of the store, such as that from Paul Covington. From these facts, the jury easily would have come to the conclusion that Kasi had committed the charged offenses, notwithstanding his comparatively infrequent presence at the store. Accordingly, there was no

possibility that any misconduct here had any impact on the jury's verdict.

<u>CONCLUSION</u>

For the above reasons, the Court should deny the defendant's motion for a new trial in its entirety.

Dated:  New York, New York
        February 20, 2008

                                Respectfully submitted,

                                MICHAEL J. GARCIA
                                United States Attorney


                                _____/s/_____
                          By:   SHARON E. FRASE
                                Assistant United States Attorney
                                Tel: (212) 637-2329

28

<u>AFFIRMATION OF SERVICE</u>

SHARON E. FRASE, pursuant to Title 28, United States Code, Section 1746, hereby affirms under penalty of perjury:

That I am an Assistant United States Attorney in the office of Michael J. Garcia, United States Attorney for the Southern District of New York.

That on February 20, 2008, I electronically filed and caused a true and correct copy of the foregoing Government's Memorandum of Law in Opposition to the Defendant's Motion For a New Trial to be served by Federal Express on:

> Paul Condon, Esq.
> 33-41 Newark Street, Suite 4A
> Hoboken, New Jersey 07030

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. 28 U.S.C. § 1746.


Dated:  New York, New York
        February 20, 2008


                    _____/s/_____
                    SHARON E. FRASE